UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| ROEANNE RICE, | ) | |
| | ) | Civil No. 12-83-GFVT |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| METROPOLITAN LIFE INSURANCE | ) | **MEMORANDUM OPINION** |
| COMPANY, | ) | **&** |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on cross-motions for judgment.  The Court construes these as a motion to overturn the administrative decision that terminated Rice's long-term disability benefits and a motion to uphold that decision. [R.15; R. 17.]  For the reasons set forth below, the Court will uphold the decision.

**I**

This case presents issues for the Court to consider under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq*.  As such, this Court exercises federal question subject matter jurisdiction.  *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 52-56 (1987).  The important facts in this case are undisputed.  Roeann Rice is 61 years old and previously worked as a clerk for nine years at Affiliated Computer Services, Inc. (ACS).  As a clerk, Rice's principal responsibilities were as follows:

- Processing paperwork in an efficient manner according to set procedures;
- Recording, posting, coding, logging, photocopying, distributing, and/or updating information;
- Assisting in the preparation of receiving reports and presentations;
- Proofing own work or work of others;
- Maintaining files in accordance with predetermined standards;
- Answering phones and routing incoming calls to appropriate offices or personnel and taking accurate messages;
- May[be] greet[ing] visitors and announcing their arrival to the appropriate staff member;
- May[be] distribut[ing] mail within the organizational unit;
- May[be] typ[ing] using typewriter or word processing software and/or performing data entry.

[ML 257.] On September 30, 2010, at age 59, Rice was injured in an automobile accident where "she suffered a broken right hand, lacerated webbing of the hand, subsequent Reflex Sympathetic Dystrophy Syndrome (RSD) from the hand injury, subsequent neuropathy from the broken hand (requiring carpal tunnel release surgery), torn rotator cuff of the right shoulder, and neck pain (disc bulge with stenosis)." [R. 15-1 at 2; ML 521-528.]

Through an arrangement with ACS, Metlife provides both short-term disability (STD) and long-term disability (LTD) benefits to ACS employees. Under the Metlife Plan, employees of ACS are eligible for STD benefits for a period of 90 days. At the end of the short-term period, employees may then apply for and receive LTD benefits. To receive LTD benefits, an employee must qualify under Metlife's definition of disability[1]:

**Disabled** or **Disability** means that, due to Sickness or as a direct result of accidental injury:

- You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and

- You are unable to earn:

---

[1] Metlife's insurance contract actually defines "disability" in two ways, depending on the employee's earnings. The standard cited applies to employees who earn less than $36,000 per year, including Rice.

o during the Elimination Period [which is 90 days in length] and the next 24 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings at Your Own Occupation from any employer in Your Local Economy; and

o after such period, approved for disability benefits under the Federal Social Security Act for Your Sickness or accidental injury.

[ML 648-649 (emphasis in original).]  The first 24 months of the LTD period is referred to as the *Own Occupation* period, because Metlife only requires persons to be unable to earn 80% of earnings from "Your Own Occupation" from an employer in "Your Local Economy."  [*Id.*]  *Own Occupation* "means the essential functions You regularly perform that provide Your primary source of earned income."  [ML 650.]  *Local Economy* "means the geographic area: within which You reside; and which offers suitable employment opportunities within a reasonable travel distance."  [ML 650.]  The Summary Plan Description (SPD) elaborates on this, explaining that "Own occupation means any activity that you regularly perform as your source of income. Your own occupation is not limited to the specific position you held at ACS and may be a similar activity that could be performed at ACS or any other employer."  [ML 835.]

At the expiration of the initial 24-month, *Own Occupation* period, an employee enters a new temporal category (referred to as the *Any Occupation* period) and is judged by a more stringent disability standard.  [ML 648-649.]  During the *Any Occupation* period, applicants are only considered disabled under the Metlife policy if they are determined disabled by the Federal Social Security Act.  [*Id.*]  The Social Security Administration (SSA) defines "disability" as a:

physical or mental impairment or impairments…of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him or whether he would be hired if he applied for work.

42 U.S.C. §423(d)(2)(A).

On October 1, 2010, Rice began receiving STD benefits from Metlife, which she received for the maximum period of 90 days. [R. 15 at 2.] Subsequently, Metlife informed Rice of their determination that she was "totally disabled," could not perform her *Own Occupation* and was approved for LTD benefits, beginning on December 30, 2010. [ML 507.] MetLife also informed Rice of her responsibility to seek Social Security Disability Benefits (SSDI) [ML 507-591; ML 661-662] and, subsequently, asked her (1) to provide proof she applied for SSDI; (2) to sign an authorization permitting Metlife access to her SSDI claim file; and (3) to sign an agreement acknowledging Rice's responsibility to refund anything she received from SSA to Metlife. [ML 507-509.] Rice submitted the required paperwork to Metlife [ML 491] and continued to receive benefits under the plan until January 31, 2011 when, upon the advice of Dr. Patrice Béliveau, she returned to work. [ML 464-465.] After briefly returning to work, Rice determined that the pain was too great and she ceased working on March 4. [ML 457-458.] Upon learning of Rice's difficulties at work, Metlife resumed paying her LTD benefits, effective March 11, 2011. [ML 434.] On May 18, Metlife sent Rice a letter inquiring about the status of her SSDI claim. [ML 413.] Rice responded, by counsel, with a letter assuring Metlife that Rice was pursuing SSDI. [ML 412.] Metlife continued to pay Rice LTD benefits until August 2, when Metlife determined that Rice was no longer disabled pursuant to the Metlife policy. [ML 360-361; R. 15-1 at 2, 5.] In a letter dated August 18, MetLife advised Rice that her LTD benefits were terminated as of August 3. [ML 360-361.] The letter explained that on July 11, 2011, Metlife had requested attending physician statements and copies of office notes and test results to confirm her continuing disability. [*Id.*] They considered the information they had received and concluded that there was "no clinical medical evidence to support a continuing

covered disability." [*Id.*]

On August 19, Rice appealed the decision and provided additional medical information from Dr. Acob to support her claim. [ML 347-351.] On September 1, Rice informed Metlife that she had been approved by the SSA for disability benefits. [R. 15-1 at 9.] Metlife responded by letter, informing Rice that her appeal request was being reviewed. [ML 344.] After conducting their internal review of the medical evidence and consulting with an independent physician consultant and a vocational expert, on November 11, Metlife affirmed its decision to terminate Rice's LTD benefits. [ML 228-232.]

## II

### A

#### 1

"[C]ourts review such challenges to benefit determinations under the *de novo* standard, unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *University Hospital of Cleveland v. Emerson Electric*, 202 F.3d 839, 845 (6th Cir. 2000) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Rice argues that Metlife's administrative decision deserves no deference and the *de novo* standard applies. Metlife argues that the most deferential, *arbitrary and capricious* standard is to be applied. The question turns on whether the benefit plan gives Metlife discretionary authority to determine eligibility and construe the plan. *University Hospital of Cleveland*, 202 F.3d at 845. This question is very much in dispute and to address it, the Court must first determine what documents are part of the benefit plan.

#### 2

An employee benefit plan ("the Plan") must be "established and maintained pursuant to a

written instrument." 29 U.S.C.A. § 1102. Such a plan can be designed to place ultimate liability for paying a claim on either the employer or an insurer that contracts with the employer. In this case, ACS had entered into an insurance contract with Metlife, referred to as the "Group Policy." [R. 15-1 at 13.] Under this Group Policy, ACS agrees to pay premiums to Metlife in exchange for Metlife providing insurance to ACS employees. ACS employees are then given a Certificate of Insurance ("Certificate") that explains their benefits under the Group Policy. [R. 15-1; ML 627-673.] The Group Policy and Certificate can be distinct documents; however, in this case they were one and the same (referred to as the "Certificate"). [R. 15-1 at 14; R. 20 at 13.] Employees were also given a Summary Plan Description ("SPD") that summarizes, in plain language, the employee's rights under the Plan. [R. 15-1 at 14; ML 685-938.] Also relevant in this case are two additional sections at the end of the Certificate, titled "special services" [ML 674-678] and "ERISA information" [ML 679-684].

Rice argues the *de novo* standard of review applies because there is no discretionary authority language in any of the Plan documents. [R. 15-1 at 13.] This argument, however, depends on a narrow interpretation of what qualifies as a Plan document. Rice directs the Court to language from the Certificate:

> Your insurance is provided under a contract of group insurance with the Policyholder. The entire contract with the Policyholder is made up of the following:
>
> 1. the Group Policy and its Exhibits, which include the certificate(s);
> 2. the Policyholder's application; and
> 3. any amendments and/or endorsements to the Group Policy.

[ML 14.] Metlife has not provided ACS' application for the policy or amendments or endorsements to the group policy. [R. 15-1 at 14.] On this basis, Rice argues that the "only Plan document available to the Court…is the Certificate." [R. 15-1 at 14.] Rice concedes that

discretion is conferred in both the SPD and the "additional information" sections, but argues that because neither are "Plan documents," this discretionary language is inadequate. [Hearing Tr. ("Tr.") at 31; R. 15-1 at 14; R. 21 at 1-2.][2] She contends that her position, construing the SPD and Information Sections as separate from the Plan, is supported by the Supreme Court's recent holding in *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1878 (2011). [R. 15-1 at 15.] In *Amara*, the Supreme Court held that "summary documents, important as they are, provide communication with beneficiaries *about* the plan, but that their statements do not themselves constitute the *terms* of the plan." 131 S. Ct. at 1878. Rice further directs the Court to the Sixth Circuit's holding in *Hogan v. Life Ins. Co. of N. Am.*, 521 F. App'x 410, 412 (6th Cir. 2013), where the Court determined that discretionary language in a summary of benefits was insufficient to confer discretion on an insurer. [R. 15-1 at 15.] To summarize, Rice argues that since only the Certificate can be construed as a Plan document, and because it fails to confer discretionary authority to Metlife, the *de novo* standard of review must apply.

Metlife argues that the *arbitrary and capricious* standard applies, asserting that the Plan does grant Metlife discretionary authority to determine eligibility for benefits. [R. 17 at 9-11; R. 20 at 12-19]. They argue the Plan grants discretion in numerous ways. First, they suggest that all the aforementioned documents were a part of the "Plan" and therefore, the discretionary language in the SPD and the Information Sections should suffice. [R. 20 at 13-15.] Second, they contend that even if not all the documents are a part of the Plan, the SPD and the Information Sections may grant discretion because they do not contradict the Plan. [R. 20 at 15-17.] Finally,

---

[2] The Court notes that it has access to the hearing transcript although it is not entered into the Docket. Should either party need access to the docket then they may follow the proper procedures for seeking its admittance.

they reason that language in the Certificate requiring "sufficient proof" be presented to Metlife sufficiently grants discretion. [R. 20 at 18-19.] The Court will address these arguments in turn.

First, Metlife argues that "ACS had no plan document or booklet for its LTD apart from the documents issued by Metlife" as of the date of Rice's injury. [R. 20 at 13.] According to Metlife, ACS intended that Metlife have the discretion to interpret terms and eligibility for LTD Plans. [R. 20 at 14; R. 20, Exhibit 1 (Affidavit).] They further note that the SPD (which does grant discretionary authority) was on ACS' website, available to employees, and its availability was made known through various e-mail notifications. [R. 20 at 13.] Hence, Metlife argues that "the SPD and the Certificate of Insurance, together with the ERISA Information at the back of the Certificate" functioned as ACS' plan documents. [R. 20 at 13.] Metlife maintains that ERISA's statutory text suggests there can be multiple, relevant plan documents. [R. 20 at 14.]

Rice concedes that discretion is granted in the SPD and the ERISA information section at the back of the Certificate. [Tr. at 31.] The Court notes that the Certificate explicitly defines what is a part of the "Entire Contract" and neither the SPD nor Information Sections are included in that list. [R. 21 at 2; ML 672.] Nevertheless, the Court will discuss both briefly.

The SPD explicitly defines Metlife's "discretionary authority" in a section by that same title:

ACS and the claims administrator [(Metlife)] have sole and exclusive discretion to:

- Interpret benefits under the applicable plan.
- Interpret the other terms, conditions, limitations, and exclusions of the applicable plan, including this SPD and any riders and amendments.
- Make factual determinations related to the applicable plan, plan benefits and eligibility requirements.

[ML 904.] Metlife directs the Court to the Tenth Circuit's declaration that Courts have "consistently held that an SPD can be part of the Plan." *Eugene S. v. Horizon Blue Cross Blue*

*Shield of New Jersey*, 663 F.3d 1124, 1131 (10th Cir. 2011) (citing *See, e.g., Pettaway v. Teachers Ins. & Annuity Ass'n of Am.,* 644 F.3d 427, 434 (D.C.Cir.2011); *Heffner v. Blue Cross & Blue Shield of Ala., Inc.,* 443 F.3d 1330, 1342–43 (11th Cir.2006); *Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.,* 293 F.3d 1139, 1143 (9th Cir.2002)); See also *Aschermann v. Aetna Life Ins. Co.*, 689 F.3d 726, 729 (7th Cir. 2012) ("There is no reason why an employer cannot make a summary plan description be part of the plan itself and thus reduce the length of the paperwork and the potential for disagreement between the summary and the full plan (though this is not how things had been done in *Amara*)"). The *Eugene* Court did provide, however, one very important caveat:

> However, an insurer is not entitled to deferential review merely because it claims the SPD is integrated into the Plan. Rather, the insurer must demonstrate that the SPD is part of the Plan, for example, by the SPD clearly stating on its face that it is part of the Plan. A contrary decision would undermine *Amara*.

*Eugene S.*, 663 F.3d at 1131. In this case the SPD states "the benefit plan descriptions contained in this SPD summarize the main features of the benefit program, and are not intended to amend, modify or expand the plan provisions." [ML 904.] Metlife has not directed the Court to any provision in the SPD that clearly states it was intended to be a part of the Plan.

The Sixth Circuit addressed this issue in *Engleson v. Unum Life Ins. Co. of Am.,* 723 F.3d 611, 620 (6th Cir. 2013) *cert. denied,* 134 S. Ct. 1024 (U.S. 2014), stating:

> Since *Amara,* we have observed that SPDs are not "legally binding," nor " 'parts' of the benefit plans themselves." *Moore v. Menasha Corp.,* 690 F.3d 444, 455–56 (6th Cir.2012) (citing *Amara,* 131 S.Ct. at 1877–78). Because SPDs lack controlling effect in the face of plan language to the contrary, we do not feel compelled to read the regulation in a manner that requires sweeping, comprehensive disclosure.

[*Id*.] The SPD cannot be the basis for Metlife's discretion.

The Information Section following the Certificate also defines the discretionary authority of Metlife:

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

[ML 682.] Rice argues that this Information Section is also not a part of the Plan. On a very pragmatic level, Rice points out that the page numbers for the Certificate end at page 45 and the next page is blank except for the warning, "THIS IS THE END OF THE CERTIFICATE. THE FOLLOWING IS ADDITIONAL INFORMATION." [ML 673-674.] The following sections are titled "special services" and "additional information". The page numbers are not continuous and the documents look like attachments.

The Ninth Circuit addressed a similar situation in, *Oldoerp v. Wells Fargo & Co. Long Term Disability Plan*, 500 F. App'x 575, 576-77 (9th Cir. 2012), ultimately reversing a District Court on the grounds that the case should have been reviewed *de novo*. In that case, the only indication that Metlife maintained discretionary authority was in the SPD and the ERISA Information document. The Court held this grant of discretionary authority was inconsistent with the Supreme Court's holding that "extraneous documents, like SPDs, '[are] not [themselves] part of the plan.' *Oldoerp*, 500 F. App'x at 576-77 (citing *Amara,* 131 S.Ct. at 1877).

Metlife argues that even if the SPD is not considered a part of the Plan, its language regarding discretionary authority is still controlling because it is not inconsistent with the language of the Plan. They argue that Courts have misinterpreted *Amara,* applying it far more

broadly than what was intended.  Metlife contends that a more narrow reading of *Amara* is appropriate, limiting its application to situations where the terms of an SPD conflict with language in other Plan documents.  Where the documents are consistent, as in this case, Metlife sees no reason to either implicate *Amara* or discount the validity of the discretionary grant in the SPD.  [R. 20 at 15.]

This approach is not unprecedented.  In *Liss v. Fid. Employer Servs. Co.,* 516 F. App'x 468 (6th Cir. 2013), the Sixth Circuit considered whether a beneficiary designation was valid that did not comply with requirements laid out in the SPD.  The Court decided that since there was no conflict between the Stock Investment Plan ("SSIP") and the SPD, that *Amara* did not apply.  *Id.* Instead they found that the "SSIP authorized the Committee to specify the particular form, which it did in the SPD." *Id*. at 473; See also *Bidwell v. Univ. Med. Ctr., Inc.*, 685 F.3d 613, 620 (6th Cir. 2012) ("Accordingly, there does not appear to be any actual conflict between the two documents, and we need not consider the applicability of the Supreme Court's recent decision in *CIGNA Corp. v. Amara,* —— U.S. ——, 131 S.Ct. 1866, 179 L.Ed.2d 843 (2011).")

This approach was also applied by the Tenth Circuit in *Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey*, 663 F.3d 1124, 1131 (10th Cir. 2011), where the Court narrowly construed the question asked in *Amara* as "whether a district court could enforce terms in an SPD where those terms conflicted with the terms in governing plan documents." (citing to *Amara,* 131 S.Ct. at 1876–78 (reviewing whether plan participants could "recover benefits based on faulty disclosures")).  The Court continued to explain their interpretation:

> We interpret *Amara* as presenting either of two fairly simple propositions, given the factual context of that case: (1) the terms of the SPD are not enforceable when they conflict with governing plan documents, or (2) the SPD cannot create terms that are not also authorized by, or reflected in, governing plan documents. We need not determine

which is the case here, though, because the SPD does not conflict with the Plan or present terms unsupported by the Plan; rather, it *is* the Plan.

*Eugene S.*, 663 F.3d at 1131. Metlife argues, as in *Eugene*, that because the SPD does not conflict with the Plan, *Amara* is not implicated and Metlife appropriately conferred discretion.

Ultimately, the Court finds it unnecessary to weigh in on the scope of *Amara* because Metlife presents the Court with an alternative means of resolving the question of whether discretionary authority was granted. In their final argument regarding the standard of review, Metlife directs the Court to the following definition of "Proof" in the Certificate:

> **Proof** means Written evidence satisfactory to Us that a person has satisfied the conditions and requirements for any benefit described in this certificate. When a claim is made for any benefit described in this certificate, Proof must establish:
>
> • the nature and extent of the Loss or condition;
> • our obligation to pay the claim; and
> • the claimant's right to receive payment.
>
> Proof must be provided at the claimant's expense.

[ML 651 (emphasis in original).] "Us" in the above citation is defined as "Metlife." [ML 652.] The Sixth Circuit has held, post-*Amara,* that "satisfactory proof" language in a STD Policy was "sufficient to grant discretionary authority" to the Insurance Company. *Hogan v. Life Ins. Co. of N. Am.*, 521 F. App'x 410, 415 (6th Cir. 2013). In *Hogan,* a plan participant brought an ERISA claim challenging the administrator's denial of benefits. She argued that her former employer had not properly delegated authority for discretionary review to the insurance company and that the insurance company's decision was not entitled deference due to this procedural shortcoming. *Id.* at 415. The District Court decided that the insurance company's " 'satisfactory proof' requirements were sufficient to require review under the arbitrary-and-capricious standard." *Id.* at 415. The Sixth Circuit took the decision on appeal and noted, as cited by Rice *supra*, that the

District Court and the insurance company had "identified …delegation of discretionary authority in the STD certificate" and that, because of *Amara*, the STD Certificate might be considered a summary document and, hence, insufficient to constitute a term of the plan.  *Id.* at 415. Nevertheless, and most relevant to this case, the Sixth Circuit affirmed the District Court's decision to apply the arbitrary and capricious standard "because the 'satisfactory proof' language in the STD Policy was sufficient to grant discretionary authority." *Hogan*, 521 F. App'x at 415. The Court explained, "[t]his circuit has treated group insurance policies as benefit plans and has concluded that the term "satisfactory proof" is sufficient to grant discretionary authority to review claims under the arbitrary-and-capricious standard of review." *Id.* (citing *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380–81 (1996); *Miller v. Metro. Life Ins. Co.,* 925 F.2d 979, 983–84).

More recently, this issue was addressed in *Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 567 (6th Cir. 2013) *cert. dismissed,* 134 S. Ct. 1057 (U.S. 2014):

> The Policy requires claimants to "provide the Insurance Company, at his or her own expense, *satisfactory proof* of Disability before benefits will be paid." This Court has found "satisfactory proof," and similar phrases, sufficiently clear to grant discretion to administrators and fiduciaries. *See, e.g., Perez,* 150 F.3d at 556 (granting discretion where "the proof or evidence of disability ... [is] satisfactory to the insurer or plan administrator"); *Miller v. Metro. Life Ins. Co.,* 925 F.2d 979, 983 (6th Cir.1991) (granting discretion "on the basis of medical evidence satisfactory to the Insurance Company"). Although the Policy could have more clearly expressed this grant of discretion, the " 'mere fact that language could have been clearer does not necessarily mean that it is not clear enough.' " *Perez,* 150 F.3d at 558 (quoting *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 381 (6th Cir.1996)).

With only minor differences, the language used in Metlife's definition of Proof in the Certificate, is the type referenced in both *Hogan* and *Frazier*.  The Court acknowledges that Metlife could have been clearer in their choice of words or could have placed the delegation of discretion in a more prominent position.  However, this does not make the grant of discretion inadequate.

*Frazier,* 725 F.3d at 567 (quoting *Perez,* 150 F.3d at 558 (quoting *Yeager,* 88 F.3d 376, 381)). Following the decisions in *Hogan* and *Frazier,* the Court finds that the "substantial proof" language Metlife used is sufficiently clear to retain discretion and, hence, trigger arbitrary and capricious review.

## B

Under the arbitrary and capricious standard, Metlife's decision is entitled to a high degree of deference. *University Hospital of Cleveland*, 202 F.3d at 845. When a Court reviews a benefit determination under the "arbitrary and capricious" standard, it should be upheld "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome . . . ." *Davis v. Ky. Finance Companies Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989). "Determining whether the plan administrator's decision was arbitrary and capricious means determining whether it was rational and in good faith, not right." *Dials v. SMC Coal & Terminal Co.*, 891 F.Supp. 373, 376 (E.D. Ky. 1995) (citing *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37, 39 (11th Cir. 1989).

## C

Rice challenges Metlife's decision on numerous grounds. [R. 15-1.] First, Rice argues that Metlife failed to consider her award of SSDI. [R. 15-1 at 17.] Second, she argues that Metlife "cherry-picked" evidence that supports their decision and ignored evidence that supports Rice. [R. 15-1 at 21.] Third, Rice claims that Dr. Simon's opinion was improperly considered as it supports a finding of disabled or, at least, provided an opinion insufficient to justify Metlife's termination. [R. 15-1 at 22.] Fourth, Rice asserts that Metlife failed to consider all the evidence submitted on appeal. [R. 15-1 at 25.] Fifth, Rice claims Melife's vocational reviewer used the wrong standard. [R. 15-1 at 26.] Finally, Rice asserts that she is entitled to attorney's fees,

costs, and interest. [R. 15-1 at 30.][3]

Before addressing these issues, it is important to address Rice's concern that because Metlife is "both responsible for paying benefits and deciding if a claimant qualifies for benefits, it has an inherent conflict on interest in its claim handling." [R. 15-1 at 16.] She notes that the reports of claim handlers, peer reviewer physicians and vocational reviewers must be viewed with skepticism as Metlife has a "clear incentive to contract with individuals who [are] inclined to find in its favor." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005) (citing *See e.g., Darland v. Fortis Benefits Ins. Co.,* 317 F.3d 516, 527–528 (6th Cir. 2003)). The law is clear that these conflicts "should be taken into account as a factor in determining whether the . . . decision was arbitrary and capricious." *University Hospital of Cleveland*, 202 F.3d at 846 (quoting *Davis*, 887 F.2d at 694). The Supreme Court recently reaffirmed that administrators acting in a dual capacity—as decision makers about benefits and payers of benefits—do have a conflict of interest and that when such a conflict is present, "that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 105 (2008) (citation omitted). Nonetheless, the weight a conflict is due depends on the circumstances of each individual case, and its existence is certainly not enough to change the review of the decision from deferential to *de novo*. *Id*. at 106.

### 1

Rice argues that Metlife improperly considered her award of SSDI. [R. 15-1 at 17.] As the Court explained, *supra* I, what definition of "disability" applies, depends on how long the

---

[3]   The Court notes that Rice also argued that Metlife has underpaid her claim and must pay her what is owed from December 20, 2010 to August 2, 2011. [R. 15-1 at 28.] Metlife concedes that Rice's benefits were underpaid and has agreed to pay the underpaid benefits to Rice, notwithstanding the outcome of the ERISA claim. [R. 20 at 21.]

applicant has been disabled under the Plan. [ML 648-649.] During the first 24 months of the disability period, the claimant is held to the *Own Occupation* standard. After the initial 24 month window ends, claimants are held to the more stringent *Any Occupation* standard. [*Id*.] Disability during the *Any Occupation* period is defined as receipt of SSDI benefits. [*Id.*] Rice's LTD benefits were terminated on August 3, 2011, while she still had thirteen months remaining during the *Own Occupation* window. [ML 360-361.] A month after this termination, on September 1, 2011, Rice informed Metlife that she had been approved to receive SSDI. [R. 15-1 at 9.] This presents a strange situation. Had Rice been in the *Any Occupation* period, she would have automatically qualified for LTD since she qualified for SSDI. Metlife argues, however, that Rice does not qualify for LTD benefits under the lesser *Own Occupation* standard because the definition of disability is not tied to the SSDI determination and Metlife's review has found her capable of assuming her old position. Rice argues that Metlife's decision is illogical and that she deserves a proper explanation. [R. 15-1 at 18.]

Metlife's response is simple. Rice was thirteen months shy of reaching the *Any Occupation* phase of its disability definition. According to Metlife, "Plaintiff's receipt of SSDI benefits would only be binding under the Plan's any occupation provision if she had received the max duration of LTD benefits under the own occupation standard, which she did not." [R. 20 at 10.] Metlife also points out that SSDI benefits were not awarded to Rice until after Metlife terminated her LTD benefits by letter dated August 18, 2011. Nevertheless they argue that they did address the SSDI benefits in their November 11 letter upholding the termination. [R. 20 at 10.] The aforementioned objections raise two questions: First, did Metlife err when it did not automatically consider Rice disabled for purposes of LTD benefits, based on the SSA determination? Second, if it did not so err, did Metlife properly consider the SSA determination

as a factor in making its decision?

Metlife did not err when it did not automatically deem Rice disabled on the basis of the SSA finding. Rice is understandably upset that Metlife's determination is inconsistent with the finding of the SSA. The Court understands that how this can be perceived as logically inconsistent. It is confusing to hear from one source that Rice cannot qualify for any job in the national economy but from another that Rice does qualify for her old job as a clerk. This must be especially frustrating for Rice since Metlife, unusually, pairs its *Any Occupation* standard with the disability determination made by the SSA. Unfortunately for Rice, however, these logical inconsistencies have no bearing on whether Metlife acted within their rights in terminating her LTD benefits.

Metlife did not bind itself to the determination of the SSA during the *Own Occupation* window. The two disability determinations are separate decisions and, while Metlife should have considered the SSA finding, discussed *infra,* it was not binding. Ultimately, the Court's decision rests on the parties right to contract. There are legitimate reasons why Metlife and ACS might have designed the plan in this way. For example, they could have decided that they did not want to issue LTD benefits unless they could be guaranteed an offset by SSDI. [ML 661.] Whatever the reason, Metlife chose to retain the right to make disability determinations for the first 24 months. The Court has been made aware of no legal reason why this is impermissible.

Second, the Court considers whether, even if SSDI was not an automatic trigger, Metlife properly considered the SSDI award in deciding whether her termination of LTD benefits was appropriate. "A determination that a person meets the Social Security Administration's uniform standards for disability benefits does not make her automatically entitled to benefits under an ERISA plan, since the plan's disability criteria may differ from the Social Security

Administration's."[4] *DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 445-46 (6th Cir. 2009) (citing *Whitaker v. Hartford,* 404 F.3d 947, 949 (6th Cir.2005)).  The Court goes on to explain the weight it should be given:

> [i]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary and capricious.

*DeLisle*, 558 F.3d at 445-46 (quoting *Bennett.,* 514 F.3d at 554.  In the case at hand, Metlife did require Rice to apply for SSDI benefits and the Certificate makes it clear that they benefit financially from the reward of SSDI.  [ML 33.]  In their letter dated November 11, 2011, Metlife indicated that they considered Rice's award of SSDI in deciding her appeal but also advised that the SSDI determination "is separate from and governed by different standards than [sic] Metlife's review."  [ML 231.]  Temporally, the Court notes that Metlife terminated Rice's benefits before she was awarded the Social Security benefits.  This, however, does not change the fact that they could have more thoroughly considered the benefits in their denial of her appeal.

A similar situation arose in *Wooden v. Alcoa, Inc.*, 511 F. App'x 477, 484-85 (6th Cir. 2013) where an insurance company's initial denial letter provided no explanation beyond stating, the SSA determination "did not support overturning the decision to terminate LTD benefits."  *Id.*  The final denial made no mention of the SSA decision.  The Court discussed the summary treatment of the Social Security determination:

---

[4] The Court notes that this is true during the *own occupation* period in this case, however, would not be true during the *any occupation* period because of the unique definition of disability in the Metlife plan.

> A casual mention of a disability determination is insufficient to constitute an "explanation" in accordance with *Bennett. See Glenn,* 461 F.3d at 671 n. 3 (rejecting administrator's claim that it "specifically discussed" a certain letter and reasoning that "the word 'discussed' [was] somewhat misleading; 'mentioned' would be a more accurate choice"); *Bennett,* 514 F.3d at 553 n. 2 (holding that a claims administrator failed to explain why it reached a conclusion contrary to an SSA decision even though "[the claim administrator's] final determination letter d [id] mention the SSA's decision.... [M]ere mention of the decision is not the same as a discussion about why the administrator reached a different conclusion from the SSA."). For these reasons, this factor weighs in favor of finding Alcoa's decision was arbitrary and capricious.[1]

*Id.* The Court concluded that:

> [While the insurance company's] cavalier treatment of [the applicant's] SSA determination weighs in favor of finding [the insurance company's] denial of benefits to be arbitrary and capricious. The review of the medical evidence and the conflict of interest, however, do not. Accordingly, we cannot conclude that its decision to terminate Wooden's benefits was arbitrary and capricious.

*Id.* (*citing Spangler v. Lockheed Martin Energy Sys., Inc.,* 313 F.3d 356, 362 (6th Cir. 2002) ("[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious.")).  As the Court found in *Wooden,* we find here, that Metlife could have been more thorough in its discussion of Rice's receipt of SSDI.  Their summary treatment, while it is a factor weighing in favor of finding the decision arbitrary and capricious, does not render their entire finding arbitrary and capricious.  *See Wooden*, 511 F. App'x at 484-85;  See also *Glenn v. MetLife*, 461 F.3d 660, 669 (6th Cir. 2006) *aff'd sub nom. Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

**2**

Rice argues that Metlife "cherry picked" evidence, specifically that Metlife's termination depended on the Attending Physician's Statement of Dr. Huff instead of opinions espoused by Doctors Acob, Belliveau and El-Kalliny.  [R. 15-1 at 21; R. 21 at 3.]  She further argues that

Metlife was not even in possession of Huff's medical records and made no effort to gather records from Huff, Acob or the SSA despite the authorizations provided by Rice that enabled them to do so. [R. 15-1 at 2.] Rice attaches to her motion as exhibits, records from Acob, Huff and the SSA. [R. 15-1 at 22; R. 15-2; R. 15-2; R. 15-4.]

As a preliminary matter, Metlife argues that the exhibits attached to Rice's Memorandum should be stricken. [R. 20 at 19-21.] Metlife argues that some of the exhibits were not given to Metlife during the administrative proceedings or are already included in the administrative record. Additionally, they assert that the Court is limited to considering the evidence in the Administrative Record and that the burden was on Rice to produce evidence sufficient to support her claim. [R. 20 at 19-21.]

The Court will not consider the additional exhibits. "[T]he district court is strictly limited to a consideration of the information actually considered by the administrator. *Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 522 (6th Cir. 1998) (finding a district court erred by reviewing additional materials supplied by Plaintiff that were outside the administrative record); *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991) ("It is true that when reviewing a denial of benefits under ERISA, a court may consider only the evidence available to the administrator at the time the final decision was made.") (citing *Crews v. Central States, Southeast and Southwest Areas Pension Fund,* 788 F.2d 332, 336 (6th Cir. 1986) (applying the principle to the "arbitrary and capricious" standard of review); *Perry v. Simplicity Engineering,* 900 F.2d 963, 966 (6th Cir. 1990) (applying the principle to the *de novo* standard of review)).

Throughout the briefing Rice refers to the "higher than marketplace standards" of ERISA fiduciaries and accuses Metlife of violating this duty by taking an "adversarial approach" with

Rice, especially as it pertains to Metlife's efforts in collecting medical information form Huff,

Acob and the SSA. [15-1 at 22.] However, "[i]t is the person claiming benefits that bears the

burden to prove that he is entitled to those benefits under the plan." *Mahone v. Pipefitters Local*

*636 Fringe Benefits Fund*, 09-13621, 2011 WL 3440122 (E.D. Mich. Aug. 8, 2011) (citing

*Ruttenberg v. U.S. Life Ins. Co. in City of New York,* 413 F.3d 652, 663 (7th Cir. 2005) (holding

that ERISA plaintiff seeking to enforce benefits under the policy bears burden of proving his

entitlement to contract benefits); see also *Seiser v. UNUM Provident Corp.,* 135 F. App'x. 794,

797 (6th Cir. Apr.22, 2005) ("The district court correctly notes that [claimant] bore the burden to

prove eligibility for disability under the terms of the policy."; *See also Miller v. Metropolitan*

*Life Ins. Co.,* 925 F.2d 979, 985–86 (6th Cir.1991) (rejecting argument that "once disability

benefits are conferred, the burden of proof lies with the insurance company to prove that the

employee can return to her former regular employment" because of language in the plan stating

otherwise.)

The question that remains is whether, based on the evidence in the medical record, there

is any evidence that Metlife improperly "cherry picked" evidence. In the letter denying Rice's

appeal, dated November 11, 2011, Metlife explains that on August 6, Huff posited that Rice

could perform her regular job duties without any restrictions. [ML 229 (referring to ML 362-

364).] Huff concluded that she could perform eight hours of work a day and that he had advised

her to return to work. [ML 363.] Rice argued that Metlife should have been more deferential to

the opinions espoused by Doctors Acob, Béliveau and El-Kalliny. [R. 15-1 at 21.]

According to Dr. Simon's phone conversation with a physician's assistant in Dr.

Béliveau's office, Rice had not been to see Béliveau since March 9, 2011 and they had no new

information on Rice since that date. [ML 238.] Béliveau did provide Metlife with a Physicians

Statement, dated July 22, 2011 [ML 372-374] that provided Rice could sit for eight hours, stand for four hours, walk for four hours, lift up to ten pounds occasionally, perform fine finger movements and push or pull with her left hand. [ML 372-373.] Additionally, Béliveau advised she could not climb or reach above shoulder level, could not perform fine finger movements with her right hand and could not push or pull with her right hand. [*Id.*] Béliveau did not recommend that Rice return to work but suggested additional therapy, job modification and/or vocational rehab. [*Id.*] Béliveau's statement was based on observations from March. [ML 238.]

The record shows that on August 19, 2011, Metlife requested that Acob, a neurosurgeon who treated Rice fill out a physician statement and provide his "most recent office visit notes" in support of Rice's claim. [ML 346.] He completed the physician's statement (dated August 26) but failed to provide any additional office visit notes. [ML 347-349 & 351.] In his Physician's Statement, Acob provided an even bleaker outlook for Rice than Béliveau. [ML 347-349, 351.] Acob did not advise Rice to return to work due to pain, numbness and tingling in her hands. [ML 348.] He provided that she could sit for four hours intermittently, stand for four hours intermittently and walk for six hours intermittently. [ML 348.] Acob noted that Rice cannot climb or reach above her shoulders, twist, bend, stoop, lift, perform fine finger movements, eye/hand movements or pushing and pulling with either hand. [ML 348.] The restrictions imposed by Acob were much more limiting than either those presented by Huff or Béliveau.

Dr. Simon spoke with Dr. Magdy El-Kalliny on October 21, 2011. In that conversation, El-Kalliny explained that Rice had had CTS release surgery on June 7, 2011 and that she had done well after surgery. [ML 239.] El-Kalliny informed Simon that, with regard to the CTS release surgery, Rice would be cleared to return to work two months after the surgery, on approximately August 7, 2011. [ML 239.] El-Kalliny did disclaim his clearance to return to

work with the caveat that he knew Rice had shoulder issues but that he was unable to address them. Instead, he referred Simon to Huff regarding the shoulder.

Huff treated Rice primarily for her shoulder issues and cleared her to return to work in early August, 2011. [ML 363.] El-Kalliny, who performed Rice's CTS release surgery, cleared Rice to return to work on or about August 7, 2011. [ML 239.] Béliveau's evaluation was based on old observations and, as will be discussed *Infra*, there were reasons to discount Acob's opinion. Ultimately, Metlife does have discretion in deciding whose medical opinions to accept.

> Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision.

*McDonald v. W.-S. Life Ins.* Co., 347 F.3d 161, 169 (6th Cir. 2003). This Court finds, after reviewing the medical evidence, that Metlife's decision provides a reasoned explanation and is neither arbitrary or capricious.

### 3

Rice argues that there were problems with both how Dr. Simon, the peer review physician, made his decision and the subsequent conclusions that Metlife drew from his findings. First, Rice argues that Simon was forced to make his determinations based on an incomplete record as she claims that "it is apparent that [Simon] was not provided the recent August 26, 2011, Attending Physician's Statement from Dr. Acob or notice that Rice had been totally disabled by the SSA." [R. 15-1 at 23].

The record shows that Dr. Simon did, in fact, have information indicating that Rice had been approved by the SSA for disability benefits as this was noted in the peer review referral. [ML 254.] Second, the record shows that Simon attempted to speak with Acob on multiple

occasions but was unable to contact him. According to Simon, he called Acob four times and was never able to speak with Acob, nor did he receive a return phone call. [R. 239.] The August 26, 2011 report that Rice references could have proved useful to Dr. Simon but its utility was limited, as is argued by Metlife:

> [W]hen [Dr. Acob's August 26, 2011 Attending Physician Statement ("APS") form] was supplied to MetLife during the appeal, no office visit notes were included, nor was there any explanation why the restrictions and limitations were nearly identical to the March 22, 2011 APS form Dr. Acob completed more than five months before. The March 22 APS form stated that Plaintiff's return to work would depend on how she responded to surgery. That surgery, performed by Dr. El-Kalliny on June 7, 2011, was successful. Yet, Dr. Acob's August 26 APS form does not address the surgery at all, let alone the fact that Plaintiff's carpal tunnel syndrome improved after the surgery.

[R. 20 at 6.] Contrary to the opinion of Acob, Rice reported to El-Kailliny that she was "doing well and that the numbness and tingling had improved" after the CTS release procedure. [R. 20 at 6 (citing ML 325-326)]. The only complaints noted in that report related to pain in her right shoulder. [ML 325-326.] Finally, as the Court has already discussed, *supra* III B, the burden of providing Metlife with proof of her disability is on Rice. The Court recognizes there was some confusion between Rice and Metlife about whether Acob's medical records were received by Metlife. [ML 106.] Metlife appears to have received medical records from Dr. Atienza, Rice's primary care physician who practices in the same office with Dr. Acob, and mistakenly relayed to Rice that they were records from Dr. Acob. [R. 15-1; ML 106-108.] As noted previously, however, this could have been remedied if Dr. Acob was more responsive to the multiple requests that were made to his office during the review process.

Second, Rice argues that, despite the absence of the above discussed information, Simon's report supports disability, or at the very least, provides an opinion insufficient to warrant upholding termination of benefits. [R. 15-1 at 22.] Rice misreads Simon's opinion

which concludes fairly that Rice had limitations but none that prevented her from returning to her own occupation.  [ML 240.]  Simon posited that Rice's shoulder might require ongoing treatment, possibly including surgery.  Nevertheless, he determines that Rice was able to work with appropriate continuing treatment and proper restrictions.  [ML 240.]  He advises that Rice should lift no more than 20 pounds occasionally and that no more than 20 percent of her time should require repetitive lifting.  [*Id.*]  With regard to her hands, Simon finds that Rice "should limit repetitive activities with the hands and wrists (typing, keying, sorting, filing) to 45 minutes out of an hour, limited to 6 hours total per day."  [ML 240.]  If anything, the restrictions that Simon imposes are even more limiting than those of Huff and El-Kalliny.  [R. 20 at 12; ML 363 (Huff Restrictions); ML 239 (Simon Report re: conversation with El-Kalliny).]

Rice protests that Simon's restriction about the amount of time Rice may use her hands is ambiguous.  The Court disagrees.  Simon cleared Rice to work for an eight hour day but restricts her to working with her "hands and wrists" to 45 minutes out of an hour, meaning that she can work with her "hands and wrists" for a total of six hours out of a standard eight hour workday.  Rice argues that, because she is paid on a production basis, this restricts Rice to working only seventy-five percent of the workday (six out of eight hours) with her "hands and wrists" and that this will prevent her from receiving 80 percent of her previous pay (as required by the *own occupation* of disability).  See ML 648-649.  The Court notes that Rice's job description provides that she has responsibilities that do not require the use of her hands.  *See* ML 257.  As such, this restriction does not necessarily prevent her from earning 80% of her previous pay.

While it would have been desirable for Simon to have the complete SSA file and the August 26, 2011 letter from Acob, not having these documents does not cause this review to be arbitrary or capricious.  With regard to Acob, there were two obvious opportunities to have the

absence of this report (assuming it was not included in the file given to Simon) from the record completely remedied. First, Acob could have returned Simon's numerous phone calls. Second, when a copy of Simon's report was sent by facsimile to Acob's office for review, there was no response. Additionally, it should be noted that Acob had referred Rice to El-Kalliny and Rice was thereafter referred to Huff. Simon spoke with both of those doctors.

There is only so much that Metlife and the peer reviewing physician can do to gather information from a non-responsive treating doctor. Simon considered medical evidence from three informed doctors and tried very hard to get in touch with another. He offers reasoned and supported restrictions that are consistent with the records he evaluated. His well informed decision and his persistence in attempting to reach Acob on multiple occasions demonstrates that his behavior was both "rational and in good faith" and cannot be the basis for finding Metlife's decision arbitrary and capricious. See *Dials*, 891 F.Supp. at 376 (citing *Guy*, 877 F.2d at 39).

**4**

Rice argues that Metlife did not consider all the evidence submitted on appeal. [R. 15-1 at 25.] The court has already addressed many of these arguments, *supra*, including Metlife's alleged failures in providing Simon with all the medical evidence and in not properly considering the SSA determination. The only new argument that Rice presents is that Metlife "made no mention of Dr. Acob's records or his two "Attending Physician's Statements" " in the letter denying Rice's appeal. [R. 15-1 at 26 (referring to ML 443-445 & ML 347-349, 351.)]

The letter denying Rice's appeal does not mention Acob's Physician Statements but Metlife advises in the letter that they have reviewed the entire claim and then list information they reviewed, with the caveat that the list is not exhaustive. [ML 229.] They further explain in the letter that the "entire claim file [was] reviewed" by Dr. Simon. [ML 229.] As noted by Dr.

Simon, he had attempted to reach Dr. Acob on four occasions but was unable to ever reach him. Again, a copy of Simon's report had been sent to Acob on October 25, 2011 but that no response was received.  [ML 230.]  Metlife could have addressed Acob's physician statement in their denial letter but it was not necessary.

Metlife does have discretion in deciding whose medical opinions to accept.  See *McDonald v. W.-S. Life Ins. Co*., 347 F.3d 161, 169 (6th Cir. 2003).  As explained earlier in this Order, there were numerous reasons to discount the opinion of Acob.  Finally, this Court's review is limited to determining not whether Metlife's decision was right but, rather, whether it arbitrary or capricious.  The Court does not find that this oversight, if it is one, qualifies as such reprehensible behavior.

**5**

Rice argues that vocational reviewer Deanna A. Denmead, erred when evaluating Rice's position.  Rice argues that Demead used the wrong standard when she judged Rice's ability to perform her own occupation against a "general nationwide job description" from the national Dictionary of Occupation Titles (DOT) instead of using local or regional standard.  [*Id*.] Furthermore, Rice suggests that the reviewer failed to consider the complete medical file and did not reference the actual duties that Rice performs at ACS.  [*Id*. at 27-28.]

Contrary to Rice's contention, Denmead explicitly noted that she reviewed Rice's own job description.  Denmead wrote, "According to the JD on file [DCN 090731F09887] this is an entry level support position…"  [ML 116.]  The code "090731F09887" is stamped at the top of Rice's job description is in the administrative record.  [ML 257.]  Denmead reviewed Rice's duties but, as explained by Metlife, had to identify what position in the DOT best represents

these duties because the ACS job description did not have specific information about how much time she spent performing the cited activities.  [R. 20 at 11; ML 257.]

Rice attempts to equate this case with *Magdziak v. Metro. Life Ins. Co.*, 920 F. Supp. 2d 782, 795 (E.D. Mich. 2013), but the cases are not similar.  In *Magdziak*, the District Court found that a vocational review was arbitrary and capricious because it depended on a doctor's "arbitrary conclusion that Plaintiff was capable of Light physical exertion" and so the vocational examiner's "ultimate conclusion regarding Plaintiff's employability" was also found to be arbitrary.  *Id*.  As the Court has already found, Dr. Simon's opinion was well informed and not arbitrary.  If anything, the restrictions that Simon imposed were even more limiting than those of Huff and El-Kalliny.  [R. 20 at 12; ML 363 (Huff Restrictions); ML 239 (Simon Report re: conversation with El-Kalliny).]  If Rice believes that dependence on the larger medical file would have produced a more favorable result from the VE, she is mistaken.

**6**

Finally, Rice makes a demand for attorney's fees, costs, and interest.  [R. 15-1 at 30.] ERISA gives the Court discretion to award reasonable attorney's fees and costs.  29 U.S.C. § 1132(g)(1).  In making its determination whether to award fees, the Court considers five factors:

> (1) The degree of the offending party's culpability or bad faith; (2) the ability of the offending party to satisfy an award of attorney's fees; (3) whether an award of fees would deter other persons from acting similarly under like circumstances; (4) the relative merits of the parties' positions; and (5) whether the action conferred a common benefit on a group of [] plan participants.

*Chambless v. Masters, Mates & Pilots Pension Plan*, 185 F.2d 869, 871 (2d Cir. 1981).  The Court has not found the decision regarding Rice's claim to be arbitrary and capricious. Furthermore, because the Court does not find any indication that the determination was made in bad faith or that there is any error the Court finds no reason to *award* attorney's fees or costs to

Rice.

## III

"[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002); see also *Cook v. Prudential Ins. Co. of Am.*, 494 F. App'x 599, 607 (6th Cir. 2012). As this Court has noted in its analysis, Metlife's review was not perfect. Their treatment of the SSDI finding was summary and Simon does not appear to have received the August 11, physician's statement from Acob. In total, however, the Court finds that the review was supported by substantial evidence and was neither arbitrary or capricious. With regard to the potential conflict, discussed, *supra* III, Metlife is in a position where it could be conflicted because of its status to profit from the denial. "If the record presented a close call as to whether substantial evidence supports [the plan administrator's] determination, evidence that the determination was tainted by conflict of interest might tip the scale." *Wical v. Int'l Paper Long-Term Disability Plan*, 191 F. App'x 360, 373 (6th Cir. 2006). Ultimately, however, the Court does not believe that this case presents such a situation. Metlife concedes that Rice is not without problems, acknowledging that she has restrictions. Nevertheless, the vast majority of medical evidence supports a finding that Rice is capable of returning to work. This was the opinion of treating doctors Huff and El-Kalliny, peer reviewing physician Simon and vocational expert Denmead.

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** that Metropolitan Life's decision is affirmed and its motion [R. 17] to uphold the administrative

decision is **GRANTED.**  Rice's motion [R. 15] to overturn the administrative decision is

**DENIED.**

This 31st day of March, 2014.

Signed By:

*Gregory F. Van Tatenhove*

**United States District Judge**